The first case on the calendar is Elizabeth W. v. Empire HealthChoice Assurance. And I believe we're ready to begin. Thank you, Your Honor. My name is Peter Sessions. I represent the plaintiff and the appellant in this case, Elizabeth W. This case is about a young woman who suffers from an awful disease, anorexia, as well as other conditions related to her eating disorder. And the record shows that she and her parents attempted to get help for her condition for years, including two hospitalizations in 2014, as well as extensive outpatient treatment with a number of providers. And unfortunately, nothing was working for her. As a result, in May of 2014, Elizabeth was admitted to the PHP, or Partial Hospitalization Program, at Oliver Pyatt Centers. This is a facility in Florida that specializes in the treatment of eating disorders. And it was there that she finally began receiving the intensive treatment that she needed, and slowly she improved. Unfortunately, the reward for her improvement was the denial of her claim for benefits with defendant Empire 60 days later. Empire's decision and the district court's ruling which upheld that decision were incorrect, and on appeal we've presented three reasons why we think that's so. First, we believe the district court used the incorrect standard of review. Second, we believe the district court gave insufficient weight to plaintiff's evidence regarding the doctor's denial rates. And finally, the district court erred in finding that under the terms of the plan, that Elizabeth wasn't entitled to benefits. So I guess I'll attack the standard of review issue first, unless the court has interest in one of the other issues. Standard of review is an important issue in these cases. Under Firestone, which is the Supreme Court decision that governs these cases, the default standard of review is de novo. And that means the burden is on the defendant to prove that it has been given a clear and unambiguous grant of discretionary authority in order to avoid that de novo review. And that's what this court. Why don't we have that in this language here? This language, we shall have all the powers necessary and appropriate to enable us to carry out our duties, including without limitation thereto the power to construe this contract, to determine all questions arising under this contract, and to make and establish and thereafter change rules and regulations and procedures with respect to this contract. The difficulty with this language is that it merely describes what Empire's duties are. It does not explain that they have discretionary authority in performing those duties. The kinds of things that this language ---- It says we shall have all powers necessary, without limitation, to construe the contract to determine all questions. You don't think that's language that gives the administrator discretion? No, because these are the kinds of things that administrators do with every plan or every insurance policy. Of course they have the power to construe the contract. That's what insurance companies do when a claim is presented to them. They have to construe the contract to determine whether benefits are payable or not. If there's a question that arises under the contract, of course they have to resolve it. They're the ones who are administering the plan. So something more is needed. It's right before the ones that my colleagues quoted. It says we may develop or adopt standards which describe in more detail when we will or will not make payments under this contract. Does that not give them the power to effectively make their own rules as to what's covered and what's not, even beyond what's in the contract? Well, I don't think so, Your Honor, because that, again, is the kind of thing that inevitably arises in these types of policies. This is a medical benefit policy. But that doesn't mean that it's not discretionary just because it appears in many policies, right? Well, what I'm arguing is that something more is needed. How about this? The issue in this case is whether the care is medically necessary, right? Yes. And in the section that defines medical necessity, the contract says medically necessary means care which, according to our criteria and in our judgment, is. And then after that it sets forth various criteria that you rely on pretty heavily. But it does say according to our criteria and our judgment. I don't know how you could get more discretionary language than to say this is what we're going to look at, but what counts is our judgment. Well, I understand that argument, but here's why I don't think it works in this case. And there's something that makes this case different from all the other cases that are cited by Empire and cited by the district court below. And this is the fact that if you look at this plan as a whole, and of course we need to do that since ERISA plans are fundamentally contracts. So we look at the entire contract in order to determine what the party's intent is. And if you look at this contract, there are places in this plan where Empire has granted itself explicitly discretionary authority to do things. And let's be honest, that's what's going on here. Empire is granting itself discretionary authority. This is not a situation where we have a plan and an insurance company and they're operating at arm's length. The plan and the policy are the same thing here. Empire wrote it. And so if you look at it to see what they intended, you'll see that they gave themselves discretionary authority explicitly. They use the word our sole discretion with regard to experimental and investigational treatments. They also give themselves discretionary authority in order to determine who is a bona fide union member. So the fact that they use this explicit language in certain parts of their policy and not in others suggests that they didn't intend to give themselves the type of authority that they're asking for here. Okay, well, I think we have your argument on that. You also argue, though, that even if there is discretion and even if the standard is arbitrary and capricious, that this decision was arbitrary and capricious, right? That's correct, Your Honor. And there's two reasons why we think that's so. First, we presented evidence regarding the denial rates of the doctors who were involved in this case. Three of the four doctors who were used had denial rates that exceeded 90%. What criteria were they applying? It occurs to me that if they were applying the criteria in this contract for when PHP care is appropriate, they're pretty stringent criteria. They go beyond what the American Psychiatric Association suggests, and it seems to me they make it rather hard to approve that kind of treatment. I mean, this is a tough contract as far as getting PHP treatment. Well, I don't think so, Your Honor. I think, actually, if you look at the Empire's guidelines, they're not particularly stringent, and I think that if the court looks at the evidence regarding Elizabeth's treatment, it will see that she did meet these criteria. Another question about those denial rates, do we know whether those are initial denial rates or denials after approval? Because this was not a case where PHP treatment was denied. It was granted, and it was granted repeatedly for short periods, adding up to a total of two months, right? So this is not a case where the reviewers said, no, you can't have that. This is a case where they said, oh, you can have that, and then there was a judgment made as to whether the improvement had been sufficient to move to a different kind of treatment. That's true, Your Honor, and I don't know. I don't think the statistics are broken down with regard to at what stage those denials took place, and that's the complaint raised by Empire and by the district court below about this evidence is that it's not sufficiently specific. Is there anything in the record about what kind of cases the doctors were reviewing with regard to those cases? The doctors are all psychiatrists, so we know that they were. And anything more specific than that? Your Honor, no, I don't believe that that's reflected in the statistics, and I understand that there is an objection that this evidence is too general. But realistically and practically, plaintiffs are never going to obtain statistical evidence for exactly the factual scenario in every case. But could I get to the heart of this decision, really, which is the plaintiff was treated for two months in this program and was showing considerable improvement. I'm correct, am I not, that there was never a goal that she would stay in that facility forever. At some point, she's supposed to transition to another less restrictive form of treatment. So what we have here, do we not, is just a medical judgment about whether it's time or not time at that particular point to make that transition? Yes, Your Honor, and I think you're getting at the heart of this case and really the central, the heart of Empire's denial, which was, yes, you still need treatment, but you don't need it at this level. And I think the evidence shows that that's not correct. And the reason why that is is because there's a big difference between PHP treatment, which is what she was receiving, and outpatient treatment. PHP treatment is, in this case, 12 hours per day of programming, including constant supervision, meal support. That's what you get in a PHP program. But in an outpatient program, you're on your own. But the people at Pyatt eventually also made a decision that it was time for her to make a transition. That was a month later, two months later, six weeks later? Right. So, I mean, we're dealing with a kind of medical judgment issue, and unlike the case with the Social Security reviews that we sometimes do, there's not a rule that says you have to defer to the treating physician. You have two different doctors taking... Why shouldn't we think that we have a case of two different doctors, or really several doctors at the Pyatt end, making a collective judgment, and several different reviewers at the insurance company end just reaching different conclusions about whether the improvement had been sufficient to ratchet down to the next level? Well, clearly that's what happened. We have competing medical opinions. And even under abusive discretion review, which we, of course, argue is not appropriate here, even under abusive discretion review, the court still has a duty to dig into that evidence and see whether it's supported by these doctors' reports. So we're supposed to say which doctors are right in our medical judgment? No. What the court needs to do is look at the doctors' opinions and see if they comport with the plan and Empire's guidelines. And that's something that the court can do. We're not asking the court to be doctors, of course. Lawyers are not doctors. But what we can do is look at Empire's guidelines, and if you look at the doctors' opinions in this case, they don't comport with the guidelines. And, in fact, in many cases, what they said are contradicted by the guidelines. For example, one of the reasons that they offered for why she did not need the PHP treatment anymore was that she was compliant with her treatment. And, in fact, compliance with treatment is a factor that weighs in favor of treatment under the Empire guidelines. Also, they said that she was medically stable, but medical stability is a factor that weighs in favor of PHP treatment. If you're not medically stable, then you actually need a higher level of care. And, also, they said she wasn't violent. She wasn't suicidal or homicidal. Well, if you're suicidal or homicidal, you can't have PHP treatment. You need a higher level of treatment. So these doctors at first... these reports at first blush sound persuasive. We have four different doctors saying this thing. How can we disagree with it? But if you really dig into what they actually said, the factors that they're raising in support of the denials don't bear any relation to what the guidelines are. And so that's why we think that the decision should be overturned in this case. Thank you. Thank you, Your Honors. Good morning. May it please the Court. Amanda Genovese of Troutman Sanders on behalf of Apelli Empire Health Choice Assurance, Inc. In this case, Empire is the administrator of the controlling health benefits plan. We submit that the district court's judgment should be affirmed in all respects. Do you mind addressing the argument that your adversary ended with, that the explanations were not consistent with the plan's own guidelines? Yes, Your Honor. From a starting point, again, we believe that the district court was correct in applying the arbitrary and capricious standard of review. And as such, that the only way that a medical necessity determination is arbitrary and capricious is if it's without reason, unsupported by substantial evidence, or erroneous as a matter of law. Going off of that, Your Honor, I also do want to bring up something that was discussed earlier. And a patient's physician's determination concerning medical necessity or what is probably... Why isn't it erroneous? The question you were asked is, why isn't it erroneous as a matter of law for the doctors to apply criteria other than the criteria in the contract? So I think what you were asked to address was, did the doctors who made this decision properly apply or indeed apply at all the criteria in the contract? Your Honor, they not only need to apply the criteria in the contract, but they did apply the criteria in the contract. The plan not only requires that the appellant meet the five criteria for medical necessity, but that for the PHP treatment, which is the eating disorder treatment at issue here, appellant also has to demonstrate the severity of illness. And the medical determinations made by four separate physicians all determined that appellant did not meet the severity of illness criteria required for continued treatment. The first reviewing physician was Dr. Jack. He not only spoke to Oliver Pyatt and the physicians over there, or I apologize, the psychiatrists over there, but determined that the inpatient treatment was no longer medically necessary. There had been substantial weight gain. There had been compliance with the treatment. And based on his professional opinion and the application of the criteria within the plan, he determined that the appellant could step down treatment to outpatient. The criteria for the outpatient treatment look awfully like the same as the criteria for the PHP program. It's a little difficult for me to figure out what the difference is in the standard. Understood, Your Honor. And the difference for the standard is for the inpatient treatment, it would have to meet the severity of illness criteria. And the severity of illness criteria looks at whether the patient is stable enough to receive treatment at an outpatient facility. So to parse down into the two separate standards, the inpatient standard obviously is much more stringent. And the doctor would have to look at it again through a scope as a physician would. I'm not going to purport to be a physician, Your Honor. And when you're looking at the outpatient treatment, which each of the four doctors said would be appropriate in this situation, there is a less intensive treatment that would be allowed due to the current condition of the appellant at that time. And again, applying the arbitrary and capricious standard of review, the court should not imply its own either ability to make a determination contrary to those of the four physicians that reviewed this case here, which is Dr. Jack, Dr. Karadziewski, Dr. Rudow, and Dr. Lal. One question that occurred to me as I looked at what I think happened here, and you can correct me if I misunderstand the record, is that these approvals are doled out for a rather short period of time each time they're given, right? And then when the first reviewing doctor decided that the treatment in the PHP was no longer medically necessary, that was more or less at day 59, and as I read it, the idea was, starting tomorrow, you're not covered. Is there no provision for any, and is there not some problem that there is not, if there is not, a provision for some kind of adjustment period? It would seem to me that if the PIA physicians thought that she needed more treatment and would be expecting to give her more treatment, they weren't preparing her, as one would expect would be appropriate, for a transition down. Am I right that the plan doctor said, sorry, you're done, period, end of story, tomorrow. You either pay the bill yourself or you've got to find another doctor, arrange a complete transition to some other form of treatment. As best you can. Let us know who you are consulting and what you want us to pay for. I'm taking heed of Your Honor's position on this point, but what I will say is there were nine consecutive pre-certifications for varying ranges of time, and at the time that a pre-certification is granted, not only does the facility here, Oliver Piat, but also the appellant is made aware of the amount of days allotted for that treatment. So to the extent that they are aware that the end of that pre-certified treatment is in fact coming to an end, they do have that end date, and at that point... That's a pretty bumpy ride. I mean, in the very first certification, it's sort of already start transitioning to something else before you even know that that's going to happen, because she was in very bad shape when she first started out. I mean, I don't know what the... And this isn't an argument that's raised by the plaintiff as such, and I'm kind of going only on my own amateur assumption that if you're, for example, taking a drug and suddenly somebody says, you don't need that drug anymore, it might be a good idea to have a step down. And it would seem that if you're having intensive inpatient treatment, it makes a difference whether you're expecting that treatment to end at the end of the week or you have no idea. And if you're suddenly told, well, now, we've been going along with this, but now no more, that there should be some transition period. But, you know, that's... And I guess to look at it a different way, Your Honor, each time a pre-certification request is being reviewed, the reviewing physician and the administrator is looking at a snapshot. They're capturing a snapshot at the time that they're making the pre-certification request. So the same way the appellant and the physicians at the facility are going on a journey here, the administrator is going on the same journey. And to the extent that there is a progression, we'll say, in the right direction, then the administrator has a duty to look at whether or not continued inpatient treatment is necessary or if it should be stepped down to a lower level of care. So I understand Your Honor's position on this point, but again... It's not a position, it's a query. Your Honor's query on this point. And I do appreciate it, and I will say that, again, there was 59 days of approved treatment from May 5th to July 2nd. On July 3rd, there had been enough progression that Empire, as the administrator of the plan, made a determination that that treatment was no longer medically necessary. They didn't shut the door. They didn't shut the door at all. And actually, each of the four reviewing physicians said, a less intensive, lower level of care would be safe and appropriate here. So to that end, Your Honor, each of the determinations made by the reviewing physicians, again, four reviewing physicians, were based on substantial evidence, and there is a lot of information in the record that these physicians exceeded the bounds of what they even needed to and what is really afforded by the court in various decisions and made inquiries with Oliver Pyatt, set up conference calls, and also looked at additional submissions through the course of the review process. So from where we stand, there was a lot of diligence there, and the correct determinations were made. I take it there's no evidence in the record that the plaintiff or the experts at Pyatt made an application for, give us another week to make a transition. They were taking a kind of all-or-nothing position that what's necessary is continued full treatment at this facility for indefinitely until we decide that it's not necessary. Based on the administrative record that I have, again, that snapshot period, I don't believe that there's any reflection of that inquiry. You know, it would be prudent for me to say that maybe it happened during one of the conference calls, but from the documentation that I have that's part of the administrative record, there's nothing to suggest that. I see my time is almost up. If the court has any additional questions, if not, we will rest on the submission of our papers. Thank you. Very briefly, Your Honors, I want to return to the issue I was discussing at the end of my argument, which was the difference between PHP treatment and IOP, intensive outpatient treatment. And Judge Lynch asked a question about the Empire's criteria with regard to intensive outpatient treatment and the similarities between those two guidelines. What's the distinction? Is there some critical language that if you have this, you get the PHP, but if you don't, you fall back into the other, or not? Well, the distinction in these guidelines is primarily about the amount of treatment you're receiving. And this is the point I want to make. At Oliver Pyatt, she was receiving 12 hours per day treatment, constant supervision, and meal support. Under the Empire guidelines, they characterize intensive outpatient treatment as three hours of treatment, three days a week. Right, but the question is, which is necessary, right? I mean, one of the problems with looking at these criteria is some of them seem to be drafted with a view to determining, you know, we're not going to cover something that calls itself PHP but doesn't have this level of treatment, or we're not going to cover something that calls itself the IOP, whatever, the next level of outpatient treatment, if it doesn't provide at least this amount, you know, which is a valuable criterion, but it doesn't tell you when one or the other is medically necessary. It just tells you that in order to qualify as a facility that we're going to cover to provide this treatment, you have to give this much. That's what you're talking about now, is the difference in how much treatment is given, not what the criteria is for deciding which one you need, if there is one. Well, Your Honor, I think even under the Empire's guidelines, there's a pretty big jump, and that's why when PHP treatment is denied, administrators need to be very sure that they're stepping someone down to the right level. And it's also important because it's in the administrator's best interest to be cautious, because as one of Elizabeth's own doctors said in the record, if you step someone down too soon, you're not actually saving any money. This is not actually beneficial to anybody. It doesn't help the patient, and it doesn't help the insurance company, because this person's going to be back at a higher level of care. Well, I see my time's up. Thank you very much, Your Honors. Thank you both for your arguments.